Watertown Abattoir Co. v. Commissioner.
Watertown Abattoir Co. v. Commissioner
Docket No. 78598.
United States Tax Court
T.C. Memo 1963-65; 1963 Tax Ct. Memo LEXIS 279; 22 T.C.M. (CCH) 258; T.C.M. (RIA) 63065; March 5, 1963
Alan L. Austin, Esq., Way-Penney Bldg., Watertown, S.D., and Irving A. Hinderaker, Esq., for the petitioner. Merrill R. Talpers, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioner's income tax for the years and in the amounts as follows: Year Ending
Deficiency
11-30-53
$ 5,095.25
11-30-54
4,429.79
11-30-55
16,374.76
The issues for decision are as follows: (1) Whether petitioner deducted excessive depreciation on its plant *280 and equipment for the fiscal years ending November 30, 1953, 1954 and 1955; (2) Whether petitioner paid to its president, David Mades, unreasonable compensation for the fiscal year ending November 30, 1955; and (3) Whether the $2,400 paid to David Mades in each of the fiscal years 1953, 1954 and 1955 was unsubstantiated as an ordinary and necessary business expense. Respondent has conceded that David Mades did not receive unreasonable compensation for the fiscal years 1953 and 1954. Petitioner concedes that it erroneously depreciated the land upon which its plant was located. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Petitioner, Watertown Abattoir Co., is a corporation located in Watertown, South Dakota. Petitioner filed its Federal income tax returns for the fiscal years ending November 30, 1953, November 30, 1954, and November 30, 1955, with the district director of internal revenue, Aberdeen, South Dakota. In 1946, a group of people from Sioux Falls, South Dakota, including Howard Wilson (hereinafter referred to as Wilson) incorporated a company known as Watertown Abattoir, Inc. (a different corporation from petitioner) *281 (hereinafter refererd to as Abattoir). Abattoir built a plant for the purpose of slaughtering horses. The plant was located about one and one-half miles south of Watertown, South Dakota. Operations were begun on or about April 1, 1947, and continued until sometime in 1949. At that time, the plant was closed and offered for sale. In August 1949, David Mades (hereinafter referred to as as Mades) rented the Abattoir plant and all its machinery and equipment on a month-to-month basis. The rental was $550 per month. Mades operated the plant as a sole proprietorship until December 1, 1950. On or about November 17, 1950, Mades caused Watertown Abattoir Co., the petitioner, to be incorporated under the laws of the State of South Dakota. Petitioner's charter was issued on or about November 17, 1950, in accordance with the corporation laws of the State of South Dakota. The stock of petitioner was held by the following shareholders in the amounts indicated: Shareholder
Shares Owned
David Mades
448
Milton McPeek
1
Ada Mades
1
On December 1, 1950, the first meetings of petitioner's stockholders and directors were held. Mades was elected president and treasurer, Ada *282 Mades was elected vice president and Milton McPeek (hereinafter referred to as McPeek) was elected secretary. At the first meeting, the officers were authorized to complete arrangements for the purpose of the Abattoir plant and equipment for a lump sum purchase price of $95,000. The purchase price was to be payable on the basis of $45,000 down with the balance being represented by a $50,000 mortgage bearing interest at the rate of 3 1/3 percent per year. The mortgage was payable at the rate of $10,000 annually beginning on December 1, 1951. At the time the transaction was closed, Abattoir purchased $55 in revenue stamps to be affixed to the deed of conveyance. On the basis of the revenue stamps purchased, the land and buildings were being valued at $50,000. The stamps together with the deed were tendered to the petitioner. Petitioner declined to accept more than $40.70 worth of revenue stamps on the ground that the property was not worth more than $37,000, divided between the land $2,000 and the buildings $35,000. The balance of the stamps were returned to Abattoir. The cost of the plant and equipment to Abattoir, the annual rate of depreciation used, [1] and the depreciation taken *283 by the company to December 1, 1950, is shown by the following schedule: Reserve for De-
Depreciated
Yearly
preciation as of
Basis as of
Rate of
Cost
Nov. 30, 1950
Nov. 30,
Depreciation
1950
Plant Building
$ 81,297.98
$14,892.14
$ 66,405.84
5%
Warehouse Building
3,914.95
555.66
3,359.29
5%
Barn
586.50
87.99
498.51
5%
Building Equipment
11,171.92
4,087.82
7,084.10
10%
Plant Equipment
55,086.31
20,202.17
34,884.14
10%
Yards
3,299.11
877.38
2,421.73
10%
Yard Equipment
322.40
255.72
66.68
25%
Riding Equipment
140.95
60.23
80.72
12 1/2%
Trucks and Trailers
1,201.01
804.24
396.77
25%
Furniture and Fixtures
2,455.96
743.52
1,712.44
10%
Totals
$159,477.09
$42,566.87
$116,910.22
Railway Spur
3,185.00
583.92
2,601.08
5%
Totals
$162,662.09
$43,150.79
$119,511.30
Land
2,000.00
2,000.00
Totals
$164,662.09
$43,150.79
$121,511.30
Shortly after the acquisition of the plant and equipment, petitioner arranged to have the building and land appraised by two appraisers *284 from the Watertown area. On or about December 16, 1950, C. L. Chase (hereinafter referred to as Chase) appraised petitioner's plant. Chase was of the opinion that on December 1, 1950, the land and buildings, exclusive of the equipment, had a fair market value of $30,000 to $35,000. Sometime in the early part of 1951, C. H. Lockhart (hereinafter referred to as Lockhart), the other appraiser, made an appraisal of petitioner's plant. Lockhart was of the opinion that the land and buildings, exclusive of the equipment, had a fair market value of $25,000. In the early part of 1951, arrangements were made with Wilson to appraise the machinery, furniture and fixtures, and equipment as of December 1, 1950. At the time of the trial, Wilson was deceased. His report indicated that he valued the machinery, furniture and fixtures, and equipment at $74,079. Based upon the values submitted by Chase, Lockhart and Wilson, petitioner allocated $35,000 of the lump sum purchase to the land and buildings and the remaining $60,000 to the machinery, furniture and fixtures, and equipment. Straight line depreciation was thereafter taken on the personal property which was estimated to have a useful life *285 of five years. No provision for salvage value was made. A useful life of twenty-five years was used as the basis for taking depreciation on the plant. Petitioner's plant was located in a swampy area near a rendering plant [2] owned by petitioner's former owners. Petitioner's former owners acted as the contractor in building the plant. The building was a semi-permanent type of building that was cheaply and poorly constructed. The building was constructed of concrete blocks eight inches in thickness. The exterior walls of the plant were approximately 26 feet high. According to the National Building Code, which was in effect in Watertown, the maximum height prescribed for a wall eight inches in thickness is 12 feet. After petitioner acquired the plant, the walls of the building began to crack. As a consequence, in or about 1957, steel rods had to be used to hold part of the building together. In addition, problems were created because of the moisture seepage through the walls. Approximately every three years a glaze had to be put on the outside walls to stop this condition. The floors also began to crack. *286 From December 1, 1950, through July 1, 1957, petitioner purchased the following equipment: Property
Acquired
Cost
Furniture & Fixtures
1951
$ 470.01
Hoist
1955
975.20
Air Compressor
1955
499.00
Well
1955
490.56
Adding Machine
1955
266.85
Truck
1953
800.00
1950 Chevrolet
1953
950.00
Tripe Washer
1956
1,604.00
Blue Prints
1956
422.20
Well
1956
573.44
Carts
1956
298.11
Chair
1956
49.92
Toilet
1956
56.44
Sump Pump
1956
60.70
Grease Press
1956
101.23
Kettle
1956
606.60
Grease Tank
1956
1,241.71
Cooker
1956
97.47
Grease Tank Connec-
tion
1957
230.39
Scale
1957
103.89
Boiler
1957
4,772.75
During the years in question, petitioner compensated Mades on the basis of the following resolution adopted December 16, 1950, by the board of directors: BE IT RESOLVED by the Board of Directors of Watertown Abattoir Co. that until further action by the Board of Directors the compensation of David Mades as President, Treasurer, and General Manager of the company, and for his services in handling all of the sales of the merchandise of the company, be and the same is hereby fixed at 2% of the gross sales of all of the *287 merchandise produced by the company, and 40% of the net annual profit before income tax. That as to the 40% of net income, that the company shall pay the same at its option at any time after the end of the fiscal year and before seventy-five days thereafter. The following schedule indicates the compensation petitioner paid Mades for the period December 1950 through September 1957, the relationship of the basic monthly salary for handling sales and the additional salary allowances based on a percentage of net profits, and the net profit remaining after salary and bonus: Basic Month-
Net Profit
ly Salary
40% of Net
After Sal-
Total
Compen-
Gross
2% of
Profit
aries and
sation to
F.Y. Ending
Sales
Sales
Bonus
Bonus
David Mades
11-30-51
$681,549.20
$13,630.98
$14,643.83
$21,965.75
$28,274.81
11-30-52
489,383.33
9,791.64
651.16
828.12
10,442.80
11-30-53
$533,152.27
$10,663.02
$ 3,225.17
$ 4,202.59
$13,888.19
11-30-54
513,957.33
10,279.15
1,890.64
2,812.57
12,169.79
11-30-55
928,861.62
18,577.25
19,315.17
22,963.19
37,892.42
11-30-56
NA *
21,647.40
18,131.73
NA
39,779.13
9-30-57
NA
2,200.00
4,348.02
NA
6,548.02
*288 Prior to August 1949, Mades had had many years of experience in the wholesale meat business in various capacities. During World War II he engaged in both the wholesale and retail sale of horse meat in the Boston and Worcester areas, and became familiar with the merchandising of horse meat and related products. During the taxable years, Mades' home was in Boston, Massachusetts. It was advantageous for him to live in the East since many of petitioner's customers or potential customers were in that area. Another advantage was that there was better control over incoming shipments of merchandise. At times, this saved petitioner from certain losses. In one instance, a load of horse meat was sold to a customer in the Boston area. The customer called Mades and complained that the meat had spoiled in transit. Mades, with the aid of several helpers, was able to salvage more than half of the shipment. From the time petitioner was purchased until the time it was subsequently sold, Mades controlled its management and direction. All the major phases of the business were controlled by him. With the exception of a few minor sales made at the plant, he handled all petitioner's *289 sales. Mades traveled extensively in calling upon prospective customers. His travel included trips to Illinois, Indiana, New York and Pennsylvania. At times, he was away from home for periods up to a month. In addition, Mades handled the labor problems at the plant, all petitioner's financial problems, and acted as a trouble shooter in the East in connection with the expediting of shipments made to the eastern seaboard and to Belgium and Holland. In developing petitioner's foreign markets, Mades contacted the Commerce Department and secured the names of all European importers of horse meat. He then began contacting those people by mail. At first, there was little success. However, Mades continued to pursue the matter until a few sales were finally made. Once the customers found that petitioner was selling a quality product, its European sales began to expand. During the taxable years, Hill Packing Company (hereinafter referred to as Hill) of Topeka, Kansas, and petitioner were the only two domestic companies selling horse meat in European markets. Hill had salesmen in Europe who solicited sales for it. Between December 6, 1952, and October 21, 1955, Mades stayed at the Grand *290 Hotel in Watertown for 148 days and paid rent of $564.25. Mades owned two cars. One of these cars was a 1950 Cadillac which he kept for five years and used for travel. Mades had a telephone in his home which was used for business as well as personal purposes. In order to be free to travel and also receive business telephone calls, Mades paid a monthly charge of $13.50 for a telephone answering service. Mades maintained an office in his home. For this purpose, he used one room of a six-room home which cost $28,000. During the taxable years, petitioner paid Mades $200 per month. On its income tax returns for the years 1953, 1954, and 1955, petitioner deducted these amounts as reimbursement for expenditures made on behalf of the company. Mades did not account to petitioner as to how the $200 per month was disbursed. To the extent of $150 per month, the expenditures were ordinary and necessary business expenses. During the taxable years, Mades owned Equine Markets (hereinafter referred to as Equine). Equine was a retail meat market located in Worcester, Massachusetts. Mades also owned the Clinton Beef Co. (hereinafter referred to as Clinton) which was sold to Swift and Company in *291 October of 1954. Prior to the time it was sold, Clinton paid Mades approximately $7,800 per year. After Clinton was sold, petitioner represented Mades' sole source of salary. He devoted his full time to petitioner in 1955. During the taxable years, no dividends were paid by petitioner. During these years petitioner was using a portion of its available funds to pay off the $50,000 mortgage to Abattoir. However, during 1956 and 1957, after the mortgage on the property had been paid, petitioner did not pay any dividends. The horses slaughtered by petitioner were bought from drovers; that is, people who gathered the horses from farms. Harold Schmelz, petitioner's bookkeeper, contacted, bought, and paid the drovers for the horses acquired by petitioner. The acquired horses, after arriving at petitioner's plant, were under the supervision of McPeek, the plant manager. McPeek was the plant manager from the date of petitioner's incorporation until the plant was sold in 1957. McPeek's duties consisted of supervising the operation of the plant. At the commencement of his employment with petitioner, McPeek received $70 per week. At the termination of his employment with petitioner, McPeek *292 was receiving $125 per week and five percent of petitioner's net profit before taxes. During the years in issue, all the hindquarters processed by petitioner were sold in Europe while the frontquarters and byproducts were sold in the United States. Approximately 25 percent to 30 percent of petitioner's total sales volume was in hindquarters. With modern methods of farm operation and the great increase in the use of tractors the supply of horses has been rapidly diminishing. The volume entitled "Agricultural Statistics for 1957" published by the United States Department of Agriculture, Table 531, shows the number of horses and mules on farms in 1940-1957 to be as follows: 1940
14,478,000
1941
14,104,000
1942
13,655,000
1943
13,231,000
1944
12,613,000
1945
11,950,000
1946
11,108,000
1947
10,129,000
1948
9,279,000
1949
8,498,000
1950
7,781,000
1951
7,036,000
1952
6,150,000
1953
5,403,000
1954
4,791,000
1955
4,309,000
1956
3,928,000
1957
3,558,000 This same table shows that the actual figures from the census figures in the census years 1940, 1945, 1950 and 1954, as shown above, were determined to be as follows: 1940
13,932,000
1945
11,629,000
1950
7,604,000
1954
4,141,000
*293 By 1960, the total number of horses and mules on farms in the United States had dropped to 3,089,000. The number of establishments in the United States slaughtering horses, the number of pounds of horse meat exported in each of the years 1950 through 1960, according to the Agricultural Research Service of the United States Department of Agriculture, is indicated by the following schedule: No. of Es-
Horses
tablish-
Slaugh-
Pounds
Year
ments
tered
Exported
1950
21
240,012
20,404,304
1951
21
319,605
10,618,684
1952
18
350,932
22,271,315
1953
18
321,545
17,968,318
1954
17
250,205
16,524,073
1955
17
237,478
16,920,391
1956
15
179,537
10,382,543
1957
13
162,506
9,720,399
1958
12
125,845
5,506,963
1959
13
88,100
1,798,350
1960
13
66,993
2,476,303
1961
8
NA
NA
In the month of March 1957 the supply of horses available to the petitioner, using the methods it had heretofore used in securing horses, dropped to such a level that petitioner could no longer operate its plant profitably. Under the circumstances a decision was made to close the plant. Subsequently, on or about March 11, 1957, Mades leased the plant *294 to Hill. The lease was for a term of five years; however, Hill had the right of termination if such an intent was manifested within the first three months of the lease. On or about May 14, 1957, Hill notified petitioner that it was exercising its option to cancel the lease. Hill stated that the plant could not be operated efficiently and would not fit into its operations. Beginning in July 1957, Mades again attempted to operate the plant; however, he was unable to secure a sufficient supply of horses and operations were discontinued. Subsequently, negotiations were again entered into with Hill. On or about August 20, 1957, a contract was entered into whereby Hill agreed to purchase all of petitioner's assets for $95,000. The contract provided that Hill was to pay $25,000 down and $7,000 a year for ten years. A note, secured by a mortgage, was given for the $70,000 balance of the purchase price. However, Hill had no personal liability on the note. Failure to make the annual payments called for would have resulted in foreclosure of the mortgage and loss of the $25,000 down payment in addition to any subsequent payments made. The contract recited that the purchase price was to be *295 allocated $3,500 to real property, $50,000 to buildings, and $41,500 to machinery, equipment and spur track. Following the acquisition of petitioner's plant, Hill enlarged the plant, made certain repairs, and added additional machinery and equipment. An addition was made to the south side of the plant which stabilized the wall. The cost of these additions and repairs to the building was approximately $100,000. The cost of the new equipment was approximately $50,000. Hill made certain changes in the operation of the plant. Production of 12 ounce packages of frozen horse meat was begun. A portion of this merchandise was packaged for human consumption while the remainder was for dog and cat food. Hill was able to reduce the cost of producing horse meat for human consumption by adding beef lungs which could be acquired at a cost of three or four times times less than horse meat. In addition, Hill also greatly expanded the territory from which horses were secured. While petitioner secured horses from a territory 200 miles east and west and 100 miles north and south from Watertown, South Dakota, Hill secured horses from Canada, Colorado, northern Nebraska, western Montana, an area *296 north of Duluth, Minnesota, and Superior, Wisconsin. The bulk of the horses came from Canada. For depreciation purposes, Hill placed the buildings acquired from petitioner on a fifteen-year life. This determination was based, in part, on the declining supply of horses. The equipment was placed on an eight-year life. The useful life of the buildings and equipment dated from September 1, 1957. Hill and the Quaker Oats Company accounted for approximately 50 percent of the horse meat sales in the United States. Petitioner competed with these companies domestically. In the notice of deficiency respondent determined that Mades' salary for the years 1953, 1954 and 1955 was unreasonable in the following amounts: Amount
Determined
Year
Salary
Unreasonable
1953
$13,889.19
$ 3,225.17
1954
12,169.79
1,890.64
1955
37,892.42
19,315.17
In the notice of deficiency respondent disallowed $2,400 in each of the three taxable years because it was determined that: Monthly allowances aggregating $2,400.00 paid to Mr. David Mades, president and stockholder, and included in the deduction claimed for travel expenses are disallowed for the reason that it has not *297 been substantiated that such expenditures constitute ordinary and necessary business expenses within the meaning of section 23(a) of the Internal Revenue Code of 1939, or that they are deductible under any other section of the 1939 Code. In the notice of deficiency respondent disallowed depreciation for the taxable years in the following amounts: Depreciation
Amount
Year
Taken
Disallowed
1953
$13,725.21
$10,560.83
1954
13,900.21
10,475.31
1955
14,157.75
10,636.48 Respondent determined "that the lump sum paid for depreciable assets acquired on December 1, 1950, should be allocated as shown in Exhibit A, attached hereto, and the correct allowance for depreciation is * * * as computed in Exhibit B, attached hereto." The following exhibits were attached to the notice of deficiency in support of the depreciation disallowance: Basis to Prior Owners
Depreciation
Reserve
Net
Cost
Nov. 30, 1950
Basis
Plant Building
$ 81,297.98
$14,892.14
$ 66,405.84
Warehouse Building
3,914.95
555.66
3,359.29
Barn
586.50
87.99
498.51
Building Equipment
11,171.92
4,087.82
7,084.10
Plant Equipment
55,086.31
20,202.17
34,884.14
Yards
3,299.11
877.38
2,421.73
Yard Equipment
322.40
255.72
66.68
Riding Equipment
140.95
60.23
80.72
Trucks and Trailers
1,201.01
804.24
396.77
Furniture and Fixtures
2,455.96
743.52
1,712.44
Totals
$159,477.09
$42,566.87
$116,910.22
Railway Spur
3,185.00
583.92
2,601.08
Totals
$162,662.09
$43,150.79
$119,511.30
Land
2,000.00
2,000.00
Totals
$164,662.09
$43,150.79
$121,511.30
*298 Ratio of
Allocated Basis to
Net Cost
Buyer on Lump
to Total
Sum Purchase
Plant Building
54.65%
$51,917.50
Warehouse Building
2.76%
2,622.00
Barn
.41%
389.50
$54,929.00
Building Equipment
5.83%
$ 5,538.50
Plant Equipment
28.71%
27,274.50
32,813.00
Yards
2.00%
$ 1,900.00
Yard Equipment
.05%
49.50
Riding Equipment
.07%
66.50
2,014.00
Trucks and Trailers
.32%
$ 304.00
304.00
Furniture and Fixtures
1.41%
1,339.50
1,339.50
Totals
Railway Spur
2.14%
2,033.00
2,033.00
Totals
$93,432.50
Land
1.65%
1,567.50
1,567.50
Totals
100.00%
$95,000.00
Date
Reserve
Asset
Acquired
Basis
11-30-52
Land (Exhibit A)
12-1-50
$ 1,567.50
Buildings (Exhibit A)
12-1-50
54,929.00
$ 2,800.00
Equipment (Exhibit A)
12-1-50
32,813.00
20,452.80
Yards and Equipment (Exhibit A)
12-1-50
2,014.00
1,255.20
Trucks and Trailers (Exhibit A)
12-1-50
304.00
189.60
Furniture and Fixtures (Exhibit A)
12-1-50
1,339.50
835.20
Railway Spur (Exhibit A)
12-1-50
2,033.00
1,267.20
$ 95,000.00
$26,800.00
Building Additions
1951
345.21
25.31
Equipment
1951
211.98
84.80
Equipment
1951
470.01
141.00
$ 96,027.20
$27,051.11
Truck
June 1953
800.00
1950 Chevrolet Auto
Oct. 1953
950.00
Electric Motor
May 1953
798.18
$98,575.38
Hoist
June 1955
975.20
Air Compressor
May 1955
499.00
Well
11-23-55
490.56
Adding Machine
Nov. 1955
266.85
Totals
$100,806.99
$27,051.11
Reserves brought forward
Depreciation Reserve at end of each year
$27,051.11
Depreciation Claimed on Returns
Depreciation Allowable
Depreciation Disallowed
*299 Esti-
Remaining
Remain-
mated
Life
Asset
ing Basis
Life
(11-30-52)
Land (Exhibit A)
$ 1,567.50
Buildings (Exhibit A)
52,129.00
30 years
28 years
Equipment (Exhibit A)
12,360.20
15 years
13 years
Yards and Equipment (Exhibit A)
758.80
15 years
13 years
Trucks and Trailers (Exhibit A)
114.40
5 years
3 years
Furniture and Fixtures (Exhibit A)
504.30
15 years
13 years
Railway Spur (Exhibit A)
765.80
30 years
28 years
$68,200.00
Building Additions
319.90
28 years
Equipment
127.18
13 years
Equipment
329.00
13 years
$68,976.09
Truck
5 years
(6 mos.)
1950 Chevrolet Auto
5 years
(2 mos.)
Electric Motor
15 years
(7 mos.)
Hoist
15 years
Air Compressor
10 years
(7 mos.)
Well
15 years
Adding Machine
10 years
(1 mo.)
Totals
Reserves brought forward
Depreciation Reserve at end of each year
Depreciation Claimed on Returns
Depreciation Allowable
Depreciation Disallowed
DEPRECIATION SCHEDULE
for De-
Depreciation Allowable
Asset
11-30-53
11-30-54
11-30-55
Land (Exhibit A)
Buildings (Exhibit A)
$ 1,861.75
$ 1,861.75
$ 1,861.75
Equipment (Exhibit A)
950.78
950.78
950.78
Yards and Equipment (Exhibit A)
58.37
58.37
58.37
Trucks and Trailers (Exhibit A)
38.13
38.13
38.14
Furniture and Fixtures (Exhibit A)
38.79
38.79
38.79
Railway Spur (Exhibit A)
27.35
27.35
27.35
Building Additions
11.43
11.43
11.43
Equipment
9.78
9.78
9.78
Equipment
25.31
25.31
25.31
Truck
80.00
160.00
160.00
1950 Chevrolet Auto
31.67
190.00
190.00
Electric Motor
31.02
53.21
53.21
Hoist
65.01
Air Compressor
29.12
Well
None
Adding Machine
2.23
Totals
$ 3,164.38
$ 3,424.90
$ 3,521.27
Reserves brought forward
Depreciation Reserve at end of each year
$30,215.49
$33,640.39
$37,161.66
Depreciation Claimed on Returns
$13,725.21
$13,900.21
$14,157.75
Depreciation Allowable
3,164.38
3,424.90
3,521.27
Depreciation Disallowed
$10,560.83
$10,475.31
$10,636.48
*300 DEPRECIATI
ON
SCHEDULE
Reserve
preciation
Asset
11-30-55
Land (Exhibit A)
Buildings (Exhibit A)
$ 8,385.25
Equipment (Exhibit A)
23,305.14
Yards and Equipment (Exhibit A)
1,430.31
Trucks and Trailers (Exhibit A)
304.00
Furniture and Fixtures (Exhibit A)
951.57
Railway Spur (Exhibit A)
1,349.25
Building Additions
59.60
Equipment
114.14
Equipment
216.93
Truck
400.00
1950 Chevrolet Auto
411.67
Electric Motor
137.44
Hoist
65.01
Air Compressor
29.12
Well
Adding Machine
2.23
Totals
Reserves brought forward
Depreciation Reserve at end of each year
$37,161.66
Depreciation Claimed on Returns
Depreciation Allowable
Depreciation Disallowed
On December 1, 1950, petitioner's plant and land had a fair market value of $35,000 and a useful life of ten years. On December 1, 1950, petitioner's equipment had a fair market value of $60,000 and a useful life of eight years. The equipment had a salvage value of fifteen percent of its fair market value on December 1, 1950. Opinion Issue 1 The issue is whether petitioner deducted excessive depreciation in the fiscal years ended November 30, 1953, 1954 and 1955. The answer to the *301 question depends on (1) whether petitioner correctly allocated the lump sum purchase price between the building and equipment and (2) whether petitioner correctly determined the useful life of the assets and their salvage value. Issue 1(A) The parties agree that the lump sum purchase price should be allocated to the different assets on the basis of their respective fair market values. The difference of opinion centers on the fair market value of the assets. Petitioner contends that it made a reasonable and proper allocation between the land and building and the fixtures, equipment and machinery which were purchased in December 1950 in allocating $35,000 to the land and building and $60,000 to the equipment. Petitioner maintains that the testimony of three witnesses establishes that the real estate and buildings did not have a value in excess of $35,000 and that the appraisals of Wilson and Mades valued the equipment at $70,000 to $75,000. Petitioner contends that respondent's allocation based solely on original cost was arbitrary. Petitioner maintains that there is no presumption that because the specific items had a certain cost in the fall of 1946 and the spring of 1947, when *302 acquired, that they had the same proportionate identical value in December 1950. It is alleged that circumstances had drastically changed and it appeared that the building was improperly constructed and was giving trouble from cracking and moisture seepage in the walls. In addition, petitioner states that this was a single-purpose building, of little value for anything other than a horse slaughtering plant. Respondent admits that original cost is but one consideration in allocating a lump sum to specified assets. Respondent contends that its allocation on the basis of original cost is supported by two other factors. Firstly, the former owners and builders of the plant made a determination of value reasonably consistent with respondent's. Respondent points out that Federal revenue stamps in the amount of $55 were purchased to be affixed to the deed of conveyance on the basis of a $50,000 valuation for the land and buildings. Respondent contends that while the stamps were refused based on such a valuation, Mades admittedly possessed no real estate appraisal experience. Secondly, the plant and equipment were sold to Hill in 1957 for the same $95,000 that Mades had originally paid. Respondent *303 points out that the contract of sale provides for a $50,000 valuation of the land and buildings, which was suggested by petitioner. We agree with petitioner's allocation. Three independent witnesses testified that petitioner's plant, exclusive of the equipment, did not have a fair market value in excess of $35,000 on December 1, 1950. The only evidence respondent can point to which tends to contradict this is an allocation on the basis of original cost, the apparent value set by the original owners, and petitioner's suggested allocation in the sale to Hill. Admittedly, cost is but one factor in determining fair market value. Respondent makes much of the fact that Mades rejected the original allocation by petitioner's former owner "although admittedly [he] possessed no real estate appraisal experience." However, there is no evidence that the original owners had any appraisal experience or that they were a better judge of the plant's fair market value. In view of respondent's previous assertion that "admittedly Mades possessed no real estate appraisal experience", it is difficult to see how much reliance could be placed on petitioner's agreement to the $50,000 allocation in 1957. *304 The only evidence relating to fair market value of the machinery and equipment is the appraisal of Wilson and Mades. Wilson was deceased at the time of the trial, and his appraisal was received for the limited purpose of showing that an appraisal had been made. Mades testified that the machinery and equipment had a fair market value of $70,000 to $75,000 on December 1, 1950. This testimony stands uncontradicted. Based on the record before us, we hold that the lump sum purchase price should be allocated as follows: Plant and land
$35,000
Machinery and equipment
60,000
Issue 1(B) For depreciation purposes, respondent determined that petitioner's plant had a useful life of thirty years rather than the twenty-five year life used by petitioner. With the exception of trucks and trailers, an air compressor and an adding machine, respondent determined that petitioner's equipment had a useful life of fifteen years rather than the five-year life used by petitioner. The uncontroverted testimony of three witnesses was that the plant, exclusive of the equipment, had a useful life of ten years on December 1, 1950, an estimate amply supported by the record. Aside from *305 the fact that it was essentially a single-purpose building, the plant was cheaply and poorly constructed. It was a semi-permanent type structure that was not likely to last an appreciable length of time without major repairs or additions. It is to be noted that in 1957 Hill spent approximately $100,000 enlarging and repairing the plant. With regard to the useful life of the equipment, [3] petitioner contends that it was no more than five years. To support its position, petitioner relies on the fact that the supply of horses was steadily diminishing. In addition, petitioner alleges that there were heavy removals of equipment after December 1, 1950. Respondent contends that his determination is supported by the fact that Hill uses a composite life of fifteen years for its equipment in its other plants. Respondent states that Hill is one of the largest processors of horse meat in the United States, "uses a composite life of fifteen years with no salvage value on as machinery and equipment and has found such life to have a good degree of accuracy * * *." We *306 see little merit in respondent's reliance upon the useful life used by Hill in its other plants. It is settled law that it is the useful life of an asset to the particular taxpayer in his trade or business which is controlling. Massey Motors v. United States, 364 U.S. 92 (1960); Hertz v. Corp. v. United States, 364 U.S. 122 (1960). The useful life of an asset is not the sole criterion for determining the amount of depreciation that can be taken. Salvage value must also be taken into consideration. Massey Motors v. United States, supra. It is not altogether clear just how petitioner arrived at a useful life of five years with no salvage value for its equipment. In any event, the record before us does not support this position. Mades testified that in 1950 he estimated the supply of horses in the area would last seven or eight years. The subsequent removal and discarding of certain equipment does not materially aid petitioner's case. In 1950, petitioner acquired approximately 120 items of equipment. The evidence indicates that approximately 48 *307 of these were removed between December 1, 1950, and September 1957. From the table in the margin, [4] it will be noted that most of the removals came in 1957. With the exception of the boiler which was replaced in July 1957, there is no evidence to indicate the cost or value of the other items that were removed. We do find that many of the assets appear to be inexpensive items such as tubs, barrels, shovels, wire holders, garbage cans, wire, wooden floor racks,heating stoves, and clipboards. There is very little evidence relating to the question of salvage value. Taking into consideration the nature of the assets, their age and other factors of record and using our best judgment, we find that the equipment had a salvage value of 15 percent of its cost to *308 petitioner. Based on the record before use, we hold that the useful life of petitioner's equipment was eight years. Issue 2 The issue is whether the salary paid to Mades in 1955 was unreasonable. There is no definite formula by which reasonableness of compensation can be judged, but rather it is a question of fact dependent upon the circumstances of each and every case. No one factor is controlling to the exclusion of others. Reasonable allowances cannot be ascertained with mathematical precision. Clinton Co. v. Commissioner, 159 F. 2d 102 (C.A. 7, 1946), affirming a Memorandum Opinion of this Court. Petitioner contends that the compensation paid Mades in 1955 in excess of $18,577.25 was not unreasonable. Petitioner contends that Mades' compensation arrangement of two percent of sales and 40 percent of the net profit before taxes was reasonable in view of the uncertainties involved in the operation of a horse slaughtering plant. Petitioner points out that Mades was the principal managing officer of the company and devoted his full time to the business in 1955. Petitioner *309 also points out that the business was unsuccessful under its former owner. Petitioner contends that it was successful solely because of the experience and ability of Mades. Without Mades, petitioner contends, there would have been no company and no income. Respondent contends that while Mades handled all petitioner's sales he remained in and around his home in Boston and was present in Watertown approximately fortynine days during the year in issue. Respondent points out that McPeek was in charge of all activities commencing with the acquisition of the horses through the shipping of the horse meat and by-products. For his intensive efforts, respondent points out, McPeek received compensation varying from $70 per week to $125 per week plus five percent of the net income. Respondent contends that assuming, arguendo, that two percent of gross sales was reasonable compensation for Mades' sales efforts, the record is devoid of any evidence indicating what additional services Mades performed or even more importantly their value. Respondent contends that the $19,315.17 in question is something other than salary, more in the nature of a distribution of profits. Respondent also contends that *310 the increased sales in 1955, which resulted in the increased payments, were not due to Mades' ability as a salesman but due in fact to a larger supply of horses. Respondent concludes that as to $19,315.17 of Mades' $37,892.42 salary, this was unreasonable and not deductible. We agree with petitioner. We believe that under the circumstances of this case Mades' compensation was reasonable. [5] When Mades took over the operation of petitioner, it was anything but certain that petitioner would be a profitable operation. Mades was taking over a business which had failed within a relatively short period of time after its operations began. The business was highly speculative not only as to the acquisition of the raw material, but as to the disposition of the finished product. Under the circumstances, it would appear that any reasonable person would expect to be well compensated if he turned the business into a profitable operation. Mades' compensation, other than the two *311 percent of gross sales, depended entirely upon his skill and ability in managing and directing petitioner's operation and upon obtaining a net profit. From December 1, 1950, to October 1957, there were only three years in which there was a substantial amount of net profit upon which the 40 percent bonus could operate. However, it is to be noted that two of these came in 1955 and 1956, just prior to the year petitioner was forced to sell out because of its inability to obtain a sufficient supply of horses to operate profitably. While petitioner employed a bookkeeper, who also had contacts with drovers, and employed a manager to perform the mechanical operation of the plant, the real reason for petitioner's success was the knowledge, ability and industry of Mades. It is true that Mades did not spend a great deal of time in Watertown; however, his time was primarily spent developing petitioner's sales. Without Mades petitioner would not have been a success. Mades has spent his entire life in the wholesale and retail distribution of meat and meat products. He has had special experience in the handling and sale of horse meat. One illustration of his ingenious capabilities is in the *312 development of petitioner's foreign markets. Mades contacted the Commerce Department and secured the names of all the European importers of horse meat. He then began contacting them through the mails and finally made a few sales. Once the customers found that he was selling a quality product, petitioner's European sales began to expand. This cost-saving technique is to be contrasted with the method used by Hill, one of the largest horse meat companies in the United States. Hill had salesmen traveling through Europe trying to make sales. There was a certain advantage to having Mades live in the East. This is where many of petitioner's customers or potential customers were located. Mades' nearness to petitioner's customers made it possible for him to maintain contact and insure their continued patronage. Another advantage was that there was better control over incoming shipments of merchandise. At certain times, this saved petitioner from certain losses. For example, a truck load of horse meat was sold to a customer in the Boston area. The customer called Mades and complained that the shipment of meat had spoiled in transit. Mades, with the aid of several helpers, was able to salvage *313 a good portion of the shipment. The evidence indicates that Mades traveled extensively in attempting to make sales. At times, he was away from home as much as a month at a time. In arriving at our decision, we have also taken into account that Mades was petitioner's controlling stockholder and that no dividends have ever been paid by petitioner. While these are strong factors to consider, we believe that the facts of this case justify the payment of $37,892.42 to Mades in 1955. It is also to be noted that through the year 1955, petitioner was paying off a mortgage of $10,000 per year. We hold that Mades' salary in 1955 was not unreasonable. Issue 3 During each of the taxable years, petitioner paid Mades $200 per month. The issue is whether these payments have been substantiated as an ordinary and necessary business expense under section 23(a) of the 1939 Code and section 162(a) of the 1954 Code. Petitioner contends that the monthly payments were to reimburse Mades for expenditures made on its behalf. Petitioner admits that better records should have been kept by Mades; however, it contends that it has conservatively demonstrated that Mades spent over $7,200 during the *314 three taxable years. Respondent contends that the proof of Mades' expenditures are mere estimates and guesses with no substantiation or verification as to dollar amounts. Respondent contends that even if it is assumed the amounts are correct, there is a question as to whether all the expenditures were made on behalf of petitioner, or whether part were made on behalf of Mades' other two businesses. The evidence indicates that Mades did an extensive amount of traveling. His travel included trips to Watertown, South Dakota, Illinois, Indiana, New York, and Pennsylvania. Between December 6, 1952, and October 21, 1955, Mades stayed at the Grand Hotel in Watertown for 148 days and paid rent of $564.25. Mades also testified that he stayed at the Lincoln and Drake Hotels in Watertown an unspecified number of days. For the 148 days that it was actually shown he was in Watertown, Mades estimated he spent $5 per day on meals or $740. Mades owned two cars. He had a 1950 Cadillac which he kept for five years and used to travel in. Mades estimated that he used this car 75 percent of the time for business purposes and that the estimated expenses of operating the car for the three years was $1,936 *315 or slightly in excess of $50 per month. Mades estimated the depreciation to be about $1,000 per year. On the basis of 75 percent for business use, this would amount to $2,250 for the three-year period. For the three-year period, Mades introduced checks indicating that his telephone bills at home averaged $44.92 per month or a total of $1,617.12. This amount was arrived at after deducting 25 percent for personal use. In order to travel and also receive telephone calls in connection with the business, Mades paid a monthly charge for a telephone answering service of $13.50 or a total of $486. Mades maintained an office in his home. He used one room of a six-room home which cost $28,000. Mades estimated that the cost of maintenance and depreciation would be $50 per month or a total of $1,800 for the three years. Mades testified that while he was traveling he made numerous long distance telephone calls from pay telephones and estimated that this amounted to about $20 per month or a total of $720 over the three-year period. Mades testified that about 10 to 15 percent of his traveling was done for Clinton. This seems to be substantiated by the fact that its territory was fairly limited. *316 Furthermore, the company was sold in October of 1954. Mades' other business was a retail market and it is difficult to see how much traveling could have been done on behalf of this company. Based on the record before us, we hold that petitioner is entitled to a deduction of $150 a month as an ordinary and necessary expense of its business. Decision will be entered under Rule 50. Footnotes
1. Except two items totaling $1,119.54 on 25 percent basis, and one item cost $474.36 on 20 percent basis.↩
2. A plant used to extract fat and other materials from dead livestock.↩
*. Not available.↩
3. We do not understand petitioner to be contesting the useful life of any of the assets acquired after December 1, 1950.↩
4. The following schedule indicates the number of items that were removed from petitioner's asset account from December 1, 1950, to September 1957: Year of Removal
Number An additional 5 items were removed; however, the date of removal is unknown. *
1950
1
1951
2
1952
5 Two of these items were sent to a used equipment dealer for resale.
**↩
1953
2
1954
7
1955
5
1956
2
1957
19
5. We do not mean to imply that Mades' compensation could not become unreasonable under the compensation arrangement in question. We merely hold that under the facts as they exist, this point was not reached.↩